IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2011

## STATE OF TENNESSEE v. DAVID HOOPER CLIMER, JR.

**Direct Appeal from the Circuit Court for Gibson County**
**No. H 8704      Clayburn Peeples, Judge**

_____

**No. W2010-01667-CCA-R3-CD  - Filed December 14, 2011**

_____

A Gibson County Circuit Court jury convicted the appellant, David Hooper Climer, Jr., of first degree premeditated murder and abuse of a corpse, and the trial court sentenced him to consecutive sentences of life and two years, respectively.  On appeal, the appellant contends that (1) the evidence is insufficient to support the premeditated murder conviction and shows he was insane when he abused the victim's corpse, (2) the trial court should have granted his motion to sever, (3) the trial court should have granted his motion to suppress his statements to police, (4) he was denied his right to a speedy trial, and (5) the trial court should have dismissed a prospective juror for cause.  Based upon our review of the record and the parties' briefs, we conclude that the evidence is insufficient to support the appellant's conviction of first degree premeditated murder but that the evidence is sufficient to support a conviction for the lesser-included offense of second degree murder.  The appellant's first degree murder conviction is reduced to second degree murder, and the case is remanded to the trial court for resentencing.  The appellant's conviction of abuse of a corpse is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Modified in Part, Affirmed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Sam J. Watridge (at trial and on appeal) and Joseph Tubbs (at trial), Humboldt, Tennessee, for the appellant, David Hooper Climer, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Garry G. Brown, District Attorney General; and Larry Hardister and Stephanie J. Hale, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual Background

The record reflects that in March 2008, the Gibson County Grand Jury indicted the appellant for first degree premeditated murder and abuse of a corpse. The victim was Dorris Deberry, his sixty-two-year-old mother.

At trial, Tracy Davis, the victim's daughter and the appellant's sister, testified that she last saw the victim in August but that she could not remember the year. The victim visited Davis in Mason Hall, Tennessee, where Davis was living with her husband. Davis's grown son usually heard from the victim every Thanksgiving and for his birthday. However, he did not hear from the victim for Thanksgiving in 2007. Davis said that she "questioned why [the victim] hadn't got in touch" with him, that she spoke with the appellant, and that the appellant told her the victim had "left with a Mexican man named Ray." The appellant also told her that the victim and Ray went to visit Ray's family. At some point, Davis talked with the appellant about filing a missing person report. She said the appellant did not seem concerned about the victim and told Davis that "he was getting pushed in a corner or something." On cross-examination, Davis testified that she did not remember the appellant's saying he was thinking about committing suicide.

Emily Fisher, the victim's younger sister, testified that she usually spoke with the victim every two or three weeks and that she last talked with the victim a few days before Thanksgiving in 2007. The victim told Fisher that the victim was going to cook Thanksgiving dinner at her home for her grandson, who was coming over. A couple of weeks later, Fisher telephoned the victim's home, but no one answered. Between Thanksgiving and Christmas, Fisher called the victim's house five or six times. No one ever answered the telephone, and Fisher left a message about three times.

Fisher testified that she received a Christmas card from the victim, which was unusual because Fisher had never received a Christmas card from her before. She said that she noticed the handwriting on the card did not belong to the victim but that she "had no inkling . . . anything was going on." On Christmas Day, Fisher telephoned the victim's home and left a message on the answering machine for the victim to call her. Fisher did not hear from the victim. On New Year's Eve, Fisher received a telephone call from Tracy Davis, who was crying. Based on Davis's call, Fisher telephoned the victim's home on New Year's Day. No one answered the telephone. Fisher left a message, stating that if she did not hear from someone that day, she was calling the police. Fisher said that later that day, the appellant called and told her that the victim had "gone off with a 'Mexican looking guy named Ray.'" The appellant also told her that he had not seen the victim since December 11 and that he did not know how to get in touch with the victim. Fisher said she asked the appellant a few more questions because "it's not anything my sister would do is go off with anybody, a man." The

next day, January 2, Fisher called the appellant and asked if he had heard from the victim. The appellant said no. Fisher said that she "just knew it wasn't right" and that she became very concerned about the victim. Within a week, she contacted the police. She learned the victim was dead on January 25, 2008.

On cross-examination, Fisher acknowledged that she and the victim did not have a close relationship. They saw each other only two or three times per year.

Pamela Nockard testified that she was the victim's landlord and lived next door to the victim. The appellant lived with the victim, and Nockard never saw the victim with a male friend. Nockard said that she and the victim worked together at "the Arsenal" for a while but that the victim was fired just before she disappeared. Nockard said she last saw the victim a couple of weeks before Thanksgiving. The victim usually paid the rent, but the appellant paid the rent in December 2007 and January 2008. When the appellant paid the rent in January 2008, Nockard asked if his family had a good Christmas. She also asked about the victim. She said the appellant told her that "they had had a great Christmas" and that the victim was "fine." Sometime right after Thanksgiving, the appellant began burning something outside. Nockard explained,

> He moved a barrel up to the front of the house and was burning stuff in it just about every night. I thought at first it might have been garbage. He had a barrel out in the dog pen burning like he was trying to keep the dogs warm.

The appellant continued to burn something in the barrel for the rest of November and into December. Nockard said that one night, she and her husband noticed a "horrific odor." Nockard said she thought the odor was the result of the appellant's burning "some kind of rubber stuff or something." She said that she had never smelled the odor before and that it lasted a couple of days.

On cross-examination, the defense asked Nockard if she knew why the victim lost her job at the Arsenal. Nockard answered, "They said she was just acting funny and . . . they told me she had been abused and they said that they thought she had alcohol in her system." She said the victim failed a company drug test, testing positive for alcohol.

Donnie Martin testified that he was part-owner of Industrial Controls and Electrical in Dyersburg. In November 2007, the appellant was working for the company as an electrician. Employees did not have to work on Thanksgiving Day. However, they had to work the day after Thanksgiving, Friday. The appellant came to work on Friday and told Martin that he needed to take the afternoon off in order to pick up his son, but Martin

refused. Martin said the appellant made a telephone call, went outside for a break, and "came back with a piece of notebook paper or piece of napkin that he had written that he resigned." The appellant left, and Martin never saw him again.

On cross-examination, Martin testified that he could not remember the exact reason the appellant gave for needing the afternoon off but that "I'm pretty sure it was his son that he was going to pick up or something." He acknowledged that the appellant was a good employee.

Detective Steve Grooms of the Gibson County Sheriff's Department testified that on January 7, 2008, the Tennessee Bureau of Investigation (TBI) contacted the sheriff's department about the missing victim. The sheriff's department began investigating the victim's disappearance. About 10:30 a.m. on January 24, Detective Grooms and other officers went to the victim's home. The officers knocked on the front and back doors, but the appellant would not answer. The officers left, obtained a search warrant, and returned to the home about 2:00 p.m. When they arrived, the appellant was coming out of the house with one of his dogs. Detective Grooms said he and other officers "took [the appellant] into custody" and transported him to the police department about 2:30 p.m.

Detective Grooms testified that officers searched the victim's home. During the search, they found what appeared to be blood on carpet, paneling, and items in the home. The officers collected samples and sent them to the TBI for testing. They also found cleaning supplies and latex gloves in the kitchen. During their initial search, the officers did not find any property that belonged to the victim. Other than a few tools, her bedroom was empty. Later, the officers found the victim's Bible and a hairbrush. Two cars were parked at the home, and the officers found the victim's bloody watch in the glove box of one of the cars. The car was registered to the victim. A burn pile was forty to fifty feet behind the house, and the burn pile looked like it had been used recently. At some point, the officers excavated the burn pile and found a pair of mattress springs. Detective Grooms identified the victim's 2004 driver's license. According to the license, the victim was five feet, five inches tall and weighed one hundred thirty-five pounds.

Detective Grooms testified that the appellant was "booked" into the jail at 2:37 p.m. on January 24. At 10:30 p.m., Detective Grooms began interviewing him. Detective Grooms said that the appellant seemed "normal" and that he did not smell alcohol on the appellant. Detective Grooms advised the appellant of his rights, and the appellant said he understood them. However, the appellant refused to sign a waiver of rights form. The appellant's interview lasted three and one-half to four hours. Although the interview was video recorded, Detective Grooms read a transcript of the appellant's entire one-hundred-thirty-page interview to the jury.

-4-

At first, the appellant claimed during the interview that he last saw the victim on Tuesday, December 11, 2007; that she left with a Hispanic male named Ray; and that the appellant had not heard from her. However, he later stated that the day after Thanksgiving, he worked all day. When he returned home from work shortly after 8:00 p.m., he found the intoxicated victim lying on the porch. He woke the victim, who had soiled her pants, and took her into the bathroom. He took off her clothes, gave her a shower, and put her to bed. The next morning, the appellant checked on the victim and went to work. He said that he telephoned the victim from work and that she told him she was "not doing too good." The appellant told Donnie Martin that he needed to leave, and Martin fired him. The appellant went home and discovered that the victim had soiled herself again. He cleaned her up and gave her some soup. The victim thought her tailbone was broken but did not want to go to the hospital. The next morning, Sunday, the appellant checked on the victim and found her lying in bed with her eyes and mouth open. The appellant said the victim had vomited "brown stuff" onto the floor and was stiff. He performed CPR on her, but he did not call 911 because he was afraid he would go to jail. The appellant said that on December 5, the victim "started smelling" and that he "cut her up." He said that he tried to burn her head in a metal bucket, that her head was "crushed up and gone," and that he thought he threw the bucket into a dumpster in Humbolt. He buried the rest of her body. He said that he loved the victim "more than life" and that she was "my world."

Detective Grooms testified that on the morning of January 25, the appellant led police officers to a location in Madison County and showed them where he had buried the victim. The victim's body was exhumed and transported to the medical examiner's office. On January 26, Detective Grooms interviewed the appellant again. During the interview, Detective Grooms informed the appellant that the police had found a lot of blood in the victim's bedroom and some blood splatter on a wall in her bedroom. The appellant denied dismembering the victim in her bedroom. He said that he dismembered her in a green plastic tub in the kitchen, that "there wasn't a lot of blood," and that "there was no splatter." He said he used a hatchet, hammer, hacksaw, and Sawzall reciprocating saw to cut up the victim. He cut off her hands and feet and boiled them on the stove in order to try to destroy the bones. However, that plan did not work, so he carried the green tub into the back yard and burned it in the burn pile. The appellant denied hitting the victim in the days before her death but said, "I have in the past." He said that the victim's ear was black and that she was "pretty beat up" from having fallen on the porch the Friday before her death.

On cross-examination, Detective Grooms acknowledged that the appellant was upset and cried during his first interview. He also acknowledged that the appellant asked him more than once to end the appellant's life. Detective Grooms said he thought the appellant's behavior was "a normal reaction of somebody that's scared they're fixing to get in trouble." He acknowledged that during the appellant's first interview, the appellant mentioned he did

-5-

not have a blanket or toilet paper in his cell. During the second interview, the appellant told Detective Grooms that he still did not have a blanket or toilet paper.

On redirect examination, Detective Grooms testified that the appellant demonstrated how he used the tools to dismember the victim. Officers found a hacksaw at the victim's home, but no blood was on it. The police never found a hatchet, hammer, or Sawzall reciprocating saw.

Dr. Miguel Laboy, the Assistant Medical Examiner for Shelby County, testified that he performed the victim's autopsy. Dr. Laboy received the victim's torso, which consisted of her thorax and abdomen. The torso was nude and covered with mud, branches, and leaves. One thigh was attached to the body, and the other thigh had been cut off at the pelvis. Ten out of twelve ribs on the victim's right side were broken, and the fractures were consistent with compression injuries a person could receive by hitting a dashboard during a car accident. Dr. Laboy also received multiple bones without any soft tissue on them. The bones corresponded to the victim's extremities and were in a bag with mud. Multiple cut marks were on the bones, and some of the bones had been burned. The victim's head and upper neck were not attached to the torso, and Dr. Laboy did not receive any of those bones. Because the victim's body was decomposing, Dr. Laboy could not see any bruising. The body contained 89 milligrams per 100 grams of alcohol. However, due to the amount of decomposition, which could have affected the body's alcohol content, Dr. Laboy could not determine how much alcohol the victim consumed before her death. He also could not determine whether the victim's injuries occurred before or after her death. He said that if the victim's rib fractures occurred before her death, the fractures could have been fatal. Based upon the autopsy and what he learned from police, Dr. Laboy concluded that the victim's cause of death was "undetermined type of violence" and that her manner of death was homicide.

On cross-examination, Dr. Laboy testified that he could not say the victim's ribs were broken before her death. He said that the victim's bones had a "normal appearance" but acknowledged that he did not test their density or fragility. He said it was possible, but highly unlikely, that CPR caused the victim's rib fractures. The victim's left coronary artery was 80% blocked with plaque, and her right coronary artery was 90% blocked. However, Dr. Laboy saw no scarring in her heart to indicate she died of a heart attack. He also saw no injuries to her internal organs. He could not determine her exact cause of death.

Dr. Steven Symes testified as an expert in forensic anthropology that he received the following bones for analysis: one of the victim's neck vertebra, her upper arms, parts of her left and right forearms, parts of her legs, a small part of her pelvis, both shin bones, and her right heel bone. Dr. Symes examined the bones microscopically and described the various

marks he found on the bones to the jury. He summarized his findings from his written report as follows:

> "The body has numerous examples of dismemberment in the form of saw cuts to the limbs and neck. The saw used may be a power saw. There is unexpected trauma. There is unexpected trauma in the form of a serrated knife, a non serrated chopping blade, [and] blunt force trauma[.] [A]lso the body's superficially burned in numerous areas."

On cross-examination, Dr. Symes testified that some very fine cuts he saw on the bones could have been caused by a scalpel during the victim's autopsy. He said the victim's bones appeared "somewhat osteoporotic" and were "very fragile." He said some of the fragility could have occurred because the bones were processed and "overcooked." He said the bones would have been "slightly fragile" while the victim was still alive. He could not say that any of the marks on the bones were made before the victim's death.

Lawrence James, a forensic scientist with the TBI, testified as an expert in forensic serology and DNA analysis that he examined and tested evidence collected from the victim's home. Testing showed that the victim's blood was on paneling in the hallway, paneling in the main bathroom, a cabinet door under the kitchen sink, a telescopic handle in the kitchen, a cabinet door under the sink in the main bathroom, and carpet in the victim's bedroom. Blood found on a vacuum cleaner bag in the home was not human blood and was consistent with dog blood. James also found the victim's blood on cardboard collected from a storage unit and on a lady's watch collected from the victim's car.

On cross-examination, James testified that he received a hacksaw for testing and that no blood was on the saw. He acknowledged that blood and DNA could be contaminated during collection. However, he found no evidence of contamination in this case.

Michael Smith testified that he and Robert Powell shared a jail cell with the appellant for about one week in March 2008. Smith said the appellant told him the following: The appellant would come home from work and find the victim "on the front porch drunk, passed out half the time." The appellant would take the victim to the bathroom and clean her up. Sometimes the appellant would "get a little rough with her" and "smack her around a little bit." One night, the appellant came home and found the victim intoxicated. He "got rough with her that night and smacked her around on her face." The victim had soiled herself, so the appellant carried her to the bathroom and cleaned her. Smith said,

> [O]ne story he found her dead in the bathroom. The second

story he picked -- one story he picked her up and turned her upside down, got all the vomit out of her and then she died in the bedroom and they switched. I don't know which one was first and which one was second, but one time he said she died this way -- he found her dead here and the second time he seen her die.

The appellant told Smith that he dismembered the victim two weeks after she died.

Smith testified that on the last night he and Powell shared a cell with the appellant, the appellant "went off the wall and started screaming and throwing things and beating the wall and in a rage." He said that the appellant was pacing, throwing things, and "threatened to kill us" and that the appellant "threatened to snap our necks and stack [our] bodies on top of each other in a pile." Smith said the appellant also stated, "'I'll bash your head in like I did that [f***ing] bitch.'"

On cross-examination, Smith acknowledged that the appellant always claimed he did not kill the victim. Smith denied provoking the appellant into a rage by stealing the appellant's Moon Pie or by going through the appellant's property. Smith knew the victim and the appellant's sister and felt sorry for them. He said that the victim was " a nice old lady" and that her death was "a damn shame." He said that he was in jail in March 2008 for a simple possession charge and that he was not under the influence of drugs at the time of the appellant's trial. He said no one had promised him anything in exchange for his testimony.

Robert Powell testified that in March 2008, he was in jail for an aggravated assault charge and shared a cell with Michael Smith and the appellant. He said that he never asked the appellant about the appellant's case but that Smith asked about it. The appellant told Smith and Powell the following: On the night of the victim's death, the appellant was smoking marijuana in the living room, and the victim was drinking a beer on the back porch. The victim came inside and walked toward the bathroom. The appellant went to check on her and found that she had fallen and soiled herself. The appellant sat the victim on the toilet, and the victim vomited "brown stuff." The appellant cleaned her up and put her on the bed. The next morning, he checked on her, found her dead, and performed CPR.

Powell testified that Smith stole the appellant's Moon Pie and that the appellant told them, "'I ought to just strip y'all down . . . kill y'all, strip y'all down naked and stack y'all on y'all's bunk.'" On the last night Powell shared a cell with the appellant, Powell and Smith woke the appellant because the appellant was snoring. Powell said the appellant "snapped" and told them that "'if I ain't gonna get no sleep ain't nobody gonna get no GD sleep.'"

Powell said the appellant was "talking all kinds of crazy" and told them, "'The last person that pissed me off I bashed their [f***ing] head in." Powell said he refused to go to sleep and reported the appellant's behavior the next day. Powell and Smith were moved to a different cell.

On cross-examination, Powell acknowledged that at the time of the appellant's trial, Powell was facing an aggravated assault charge for using scissors to stab someone. He denied receiving anything from the State in exchange for his testimony but acknowledged that his attorney talked with the State about his charges. The appellant never said he killed the victim.

Dr. Robert W. Kennon, a licensed psychologist, testified for the appellant as an expert in forensic psychology that he evaluated the appellant on February 11, February 18, and March 17, 2008. He also administered psychological tests to the appellant. Dr. Kennon concluded that the appellant suffered from paranoid personality disorder due to alcohol dependence and impulse control disorder. Dr. Kennon explained that people with paranoid personality disorder had problems with relationships and trusting people. He said they were prone to deteriorating psychologically and could become delusional. Dr. Kennon explained that the appellant's mistrust of people arose out of some of his early childhood experiences and that the appellant demonstrated "magical thinking." Dr. Kennon said the appellant "adored" the victim and "placed her on a pedestal." After the victim died, the appellant thought he could heal her and bring her back to life. The appellant's thinking was delusional and was caused by stress from the victim's death. Dr. Kennon said the appellant grew up in a violent atmosphere and thought he needed to protect the victim. Dr. Kennon said that the appellant was the victim's caregiver and that "[i]t doesn't make sense that he would want to harm the person that he loves, has cared for."

Dr. Kennon testified that the appellant denied killing the victim. However, the appellant told Dr. Kennon that he tried to control the victim's drinking and behavior by hitting her. The appellant denied that he hit the victim on her head but said that he hit her on her shoulders or back. Dr. Kennon described the appellant's abuse of the victim as very similar to a "parent/child reversal relationship" and said the appellant abused the victim "to try to control her and to prevent her from deteriorating." Dr. Kennon said that after the victim's death, the appellant was not in full contact with reality and could not appreciate the wrongfulness of dismembering the victim. Dr. Kennon acknowledged that the jail outburst described by Smith and Powell was typical of someone suffering from paranoid personality disorder.

On cross-examination, Dr. Kennon acknowledged that a person could direct violence toward an individual the person loved and could kill the individual. The fact that the

appellant was employed and looked after the victim suggested he was not delusional before her death. At the time of the victim's death, the appellant could appreciate the wrongfulness of his actions. However, the victim's death led to the appellant's psychological deterioration. At that point, the appellant became delusional and dismembered the victim. By the time Dr. Kennon interviewed the appellant, the appellant understood the wrongfulness of dismembering her. The State asked Dr. Kennon if he was aware that the appellant had boiled the victim's hands, and Dr. Kennon said no. He said that while the appellant's actions suggested he was trying to cover up what he had done, "you have to take that in light of his paranoia and his delusions that he was being spied upon." Dr. Kennon acknowledged that the appellant tried to manipulate and control the victim. He also acknowledged that the appellant physically abused her and that the abuse may have contributed to her death. The appellant had difficulty accepting that his actions may have led to or contributed to the victim's death. Dr. Kennon said that the appellant had a mental disease or defect when he examined the appellant and that the appellant continued to have a mental disease or defect at the time of trial.

Dr. Samuel Craddock, a psychologist from the Middle Tennessee Mental Health Institute (MTMHI), testified on rebuttal for the State as an expert in forensic psychology. The appellant was a patient at the facility for twenty-seven days during August and September 2009, and Dr. Craddock evaluated him. All of the doctors at the facility agreed that the appellant was competent to stand trial. Dr. Craddock concluded that the appellant suffered from dysthymic disorder, also known as low-level chronic depression, and substance abuse. The depression was treatable, and the appellant was prescribed medication. The appellant had suffered from depression previously and had received mental health treatment for it. Dr. Craddock said that the appellant gave a "remarkably similar account" of the victim's death to doctors at MTMHI and Detective Grooms. Regarding the appellant's dismembering the victim, Dr. Craddock said the appellant did not describe himself as being out of touch with reality but described himself "as though he were looking down on what he was doing." He said that the appellant's "perception of what was going on was less than healthy, but I would not call him psychotic."

Dr. Craddock testified that he disagreed with Dr. Kennon's diagnosis of paranoid personality disorder because testing did not suggest the appellant suffered from the condition and because the appellant "did not tell us anything about somebody being under his porch or the CIA or anything of this nature." He said paranoid personality disorder was a pervasive condition that did not last for short periods of time. Although the appellant did not appear to suffer from a personality disorder, he showed the propensity to have impulse control disorder. Dr. Craddock did not conclude that the appellant had a severe mental disease or defect. The appellant's use of marijuana at the time of the victim's death may have been a contributing factor to his mental functioning at the time of the crimes. However, his

substance abuse did not impair his ability to appreciate the wrongfulness of his actions. Dr. Craddock said the appellant felt responsible for taking care of the victim. Although the appellant did not like cleaning up her accidents, he did so anyway.

Dr. Craddock testified that the appellant was not dysfunctional before the victim died. He said that after the victim's death, the appellant became less functional "simply because he had a dead person before him and [did not know] what to do about it." He said that the appellant used poor judgment and that "it just eventually caught up with him." He said the appellant consistently stated that he loved the victim. However, the appellant had a history of abusing her. At times, the appellant loved the victim very much; at other times, he became exasperated and impatient with her. Dr. Craddock described the appellant's feelings toward the victim as "human nature." He said that if the appellant's abuse contributed to the victim's death, the appellant was capable of appreciating the wrongfulness of his conduct.

On cross-examination, Dr. Craddock acknowledged that he interviewed the appellant twenty months after the crimes and that the appellant's mental condition may have been different closer in time to the crimes. The appellant never indicated that he killed the victim. The appellant always loved the victim but would get frustrated with her. Regarding the appellant's ability to appreciate the wrongfulness of his conduct, Dr. Craddock explained that

> at times [the appellant] may have perhaps strong armed her out of frustration or whatever and only realized later how fragile she was and that it was abuse or perhaps -- he talked about trying to, I think, sit her in the tub and clean her up and so forth and to handle somebody in their sixties, . . . I think we all know what that means in an elderly person. They are very fragile. Their bones are fragile. Their skin is fragile, so I don't know whether he was able to appreciate that he was abusing her at the time, whereas, if you were to look at her she might appear abused, so, you know, that's really difficult to do. You know, I don't want to accuse him of something that he didn't do. You know, I don't know, but would he know intentional abuse, certainly. I think we all would know that.

On redirect examination, Dr. Craddock testified that the appellant's telling people that the victim left with Ray "was a way of delaying what was inevitable" and was not an example of the appellant's being psychotic. The appellant's disposing of the victim's body was an indication that the appellant was aware of the wrongfulness of his conduct. However, a psychotic person also could conceal evidence. Dr. Craddock said it was "very unlikely" the appellant was psychotic.

During jury deliberations, the jury sent out a question to the trial court, asking, "'Can the Judge provide clarity on the definition of premeditated?'" The trial court referred the jury to the definition given during the jury charge and read the instruction aloud. The jury convicted the appellant of first degree premeditated murder and abuse of a corpse. The trial court immediately sentenced him to life for the murder conviction. After a sentencing hearing for the abuse of a corpse conviction, a Class E felony, the trial court sentenced him to two years and ordered that it be served consecutively to the life sentence.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

## 1. First Degree Murder

The appellant contends, without any argument or citation to authorities, that the evidence is insufficient to support the conviction for first degree premeditated murder. The State asserts that the appellant is not challenging the sufficiency of the evidence and does not address the issue.[1]

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Initially, we note that the parties' opening and closing statements, in which the State would have argued its theory of the case to the jury, have not been included in the record on appeal. According to the State's brief, the prosecution's theory of the case was that the appellant "killed his mother and dismembered her body and hid it to conceal his crime."

The exact circumstances surrounding the victim's death were not revealed at trial. The appellant told Detective Grooms that he found the intoxicated victim on the porch, cleaned her up, and put her to bed. The next day, Saturday, he checked on her. On Sunday, he found the victim dead. The appellant also told Smith and Powell that he found the victim dead, and Dr. Laboy could not determine her exact cause of death. The State presented no evidence

---

[1]In stating the issue, the appellant has combined his sufficiency of the evidence claim with his claim that the trial court should have severed the offenses. However, the appellant clearly says that the evidence is insufficient to support the conviction for first degree murder.

that the appellant made declarations of an intent to kill the victim, that he procured and used a deadly weapon on the unarmed victim, that the manner of the killing was particularly cruel, that he inflicted multiple wounds upon the victim, or that he prepared before the murder to conceal the crime. The State also produced no evidence regarding his calmness immediately after the killing, his motive, or his use of multiple weapons in succession. As for the appellant's destruction of evidence, this alone will not suffice for premeditation. See State v. Shepherd, 862 S.W.2d 557, 565 (Tenn. Crim. App. 1992) ("The inference of guilt which may flow from flight, concealment of the body, and false statements is a general one and does not provide weight to the degree of homicide which may be involved.") (citing Waldie v. State, 230 S.W.2d 993, 995 (Tenn. 1950)). Therefore, the evidence is insufficient to show that the appellant killed the victim with premeditation.

The evidence is sufficient to show, however, that the appellant had a history of abusing the victim and that he physically abused her two days before she died. The appellant told Smith and Powell, "I'll bash your head in like I did that [f***ing] bitch." He also told them, "The last person that pissed me off I bashed their [f***ing] head in." Taken in the light most favorable to the State, the jury could have found that the appellant killed the victim intentionally. Therefore, the evidence is sufficient to support the lesser-included offense of second degree murder, which is the knowing killing of another. See Tenn. Code Ann. § 39-13-210(a)(1); see also Tenn Code Ann. § 39-11-301(a)(2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). The appellant's conviction is reduced to second degree murder, and the case is remanded to the trial court for resentencing.

### 2. Abuse of a Corpse

Regarding his abuse of a corpse conviction, the appellant contends that he established the affirmative defense of insanity by clear and convincing evidence and, therefore, should have been found not guilty by reason of insanity. The State contends that the jury properly rejected the appellant's insanity defense. We agree with the State.

Abuse of a corpse occurs when a person, without legal privilege, knowingly "[p]hysically mistreats a corpse in a manner offensive to the sensibilities of an ordinary person." Tenn. Code Ann. § 39-17-312(a)(1). The current insanity defense provides as follows:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts.

Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Tenn. Code Ann. § 39-11-501(a). Evidence is clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999).

Taken in the light most favorable to the State, we conclude that a reasonable trier of fact could have found that the appellant failed to establish by clear and convincing evidence that, as a result of a severe mental disease or defect, he was unable to appreciate the nature and wrongfulness of his acts. The parties presented conflicting expert opinions regarding the appellant's mental state at the time of the dismemberment. Dr. Kennon testified for the defense that the appellant became delusional after the victim's death and could not appreciate the wrongfulness of his conduct. However, Dr. Craddock concluded that the appellant never suffered from a severe mental disease or defect. Moreover, the evidence established that the appellant went to methodical lengths to conceal the victim's death and dismemberment, telling her family that she left with Ray and forging a Christmas card to her sister. As our supreme court has explained, "The weight and value to be given expert testimony is a question for the jury. . . . Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citations omitted). Given the evidence, a rational trier of fact could have rejected the appellant's insanity defense. The evidence is sufficient to support the conviction for abuse of a corpse.

### B. Motion to Sever

The appellant contends that the trial court should have granted his motion to sever the offenses. The State contends that the trial court properly denied the motion. We agree with the State.

The appellant was charged with both offenses in the same indictment. Before trial, he filed a motion to sever. At the motion hearing, the defense argued that the offenses should be severed because the abuse of a corpse case was extremely prejudicial to the murder case and because the evidence introduced at one trial would be inadmissible at the second trial. In support of the latter argument, defense counsel stated that he would be presenting an insanity defense on the abuse of a corpse charge but not on the murder charge and that photographs of the dismembered victim would be inadmissible at the trial on the murder charge because they were highly prejudicial. Without any explanation, the trial court denied

-15-

the motion.

Tennessee Rule of Criminal Procedure 8(b) states that two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b)(1), (2). Tennessee Rule of Criminal Procedure 13(b) provides that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14. Rule 14(b)(1) provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."

Our supreme court has held that "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999).

In examining a trial court's ruling on a severance issue, the primary consideration is whether the evidence of one offense would be admissible in the trial of the other if the offenses remained severed. See Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000). Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Id. (quoting Moore, 6 S.W.3d at 239). As such, the trial court must determine from the evidence presented that

> (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. (citations omitted).

This court previously has concluded, "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer, 12 S.W.3d at 447. Typically, common scheme or plan evidence tends to fall into one of the following three categories:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

Moore, 6 S.W.3d at 240.

Initially, we note that the trial court failed to give the parties any explanation for its denial of the appellant's motion. Nevertheless, we can conclude that severance was not required in this case.

The appellant claimed in his statement to Detective Grooms that he found the victim dead in her bed. He also stated that he disposed of her body by dismembering it, burning part of it, and burying part of it. However, the State's theory was that the appellant murdered the victim and disposed of her body as part of a continuing plan. Thus, the first prong of Rule 14(b)(1) has been met.

Next, we must determine whether Tennessee Rule of Evidence 404(b) would have allowed evidence of one offense to be admissible in the trial of the other if the offenses had been severed. Evidence of other crimes may be admissible to show identity, motive, intent, guilty knowledge, absence of mistake or accident, or a common scheme or plan. See State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.6 (3d ed. 1995)). "Concealment of the victim's body tends to show the guilt of the accused on the offense of murder." State v. Furlough, 797 S.W.2d 631, 642 (Tenn. Crim. App. 1990). Therefore, evidence that the appellant dismembered, burned, and buried the victim in an attempt to conceal her body was relevant to show he murdered her. Likewise, evidence that the appellant murdered the victim was relevant to show he had a motive to dismember, burn, and bury her body. Regarding probative value, we acknowledge that evidence of the appellant's abusing his mother's corpse would be highly prejudicial to his murder case. On the other hand, the extreme measures taken by the appellant to conceal his mother's body also would be highly relevant to show he murdered her. Therefore, we cannot say that the probative value of the evidence was outweighed by the danger of its prejudicial effect. The trial court did not err by denying the appellant's motion to sever.

## C. Motion to Suppress

The appellant contends that the trial court should have suppressed his statements to Detective Grooms because they were involuntary and because he was denied his Fifth Amendment right to counsel. The State contends that the trial court properly denied the appellant's motion to suppress. We conclude that the appellant is not entitled to relief.

-17-

Before trial, the appellant filed a motion to suppress his statements to Detective Grooms on the basis that they were involuntary. Specifically, the appellant argued that he gave the statements after being held in a cold jail cell without a blanket or bed and based upon promises the detective made to him. In addition, he argued that he was denied his right to counsel and confined in jail without due process of law.

At the suppression hearing, Detective Grooms testified for the State that on the morning of January 24, 2008, he and another officer set up a hidden camera in his office "to be prepared for a statement that we [were] going to get from Mr. Climer." Later, Detective Grooms and other officers went to the victim's home and knocked on the doors, but the appellant would not answer. The officers left, obtained a search warrant at 1:18 p.m., and returned to the victim's house. They arrived as the appellant was exiting the home with one of his dogs. Detective Grooms said that the officers "took [the appellant] into custody" by putting handcuffs on him and putting him into a patrol car. The appellant sat in the patrol car for fifteen or twenty minutes until an officer transported him to jail. Other officers remained at the victim's home and searched it for four or five hours. Detective Grooms said that while officers were searching the victim's home, the appellant was detained at the jail "for investigative purposes." The appellant was held in the "drunk tank," a holding cell. Inmates in the drunk tank had toiletries and a mattress to put on the concrete floor. Detective Grooms said the appellant had not been arrested or charged with a crime at that time.

Detective Grooms testified that he began interviewing the appellant in his office at 10:30 p.m. He acknowledged that the appellant's interview was video recorded and that he lied to the appellant by telling him it was not recorded. Detective Grooms said he made one promise to the appellant, i.e., to telephone the appellant's father and ask him to pick up the appellant's property. Detective Grooms acknowledged that he read Miranda warnings to the appellant from a waiver of rights form. Detective Grooms said that although the appellant would not sign the form, there was "[n]o doubt whatsoever" that the appellant understood his rights. The appellant cried twice during the interview and asked Detective Grooms to shoot him. In 2005, the victim had accused the appellant of beating her with a flashlight. Detective Grooms said his theory of the case was that the appellant came home and found the intoxicated victim. The victim had defecated on herself, the appellant became angry, and he hit the victim several times. The appellant admitted during his interview that he had hit the victim previously. However, he never admitted to killing the victim. Detective Grooms acknowledged that he told the appellant he did not think the appellant killed the victim with premeditation. He also acknowledged that the appellant may have complained about not having a blanket in his cell. After the interview, Detective Grooms requested that jailers give the appellant a blanket and something to eat. He did not know whether the appellant received a blanket.

-18-

Detective Grooms testified that on the morning of January 25, he drove the appellant to an area off Windy City Road in Madison County. They talked during the drive, and their conversation was audio recorded. During the conversation, the appellant was upset and crying. Detective Grooms did not advise the appellant of his rights before the appellant talked to him. The appellant showed Detective Grooms and other officers where he had buried the victim, and another officer transported the appellant back to jail.

Detective Grooms acknowledged that when he interviewed the appellant on January 26, the appellant's mood had deteriorated, and the appellant complained about being awakened every fifteen minutes. Detective Grooms said that he thought the appellant had been placed on suicide watch and that jailers checked on suicidal inmates every fifteen minutes.

On cross-examination, Detective Grooms testified that the only lie he told the appellant during the first interview was that the interview was not being recorded. Detective Grooms said that the appellant "did not specifically ask for an attorney" during the interview. Although the appellant asked about getting a court-appointed attorney that night, Detective Grooms told him no because it was 10:30 p.m. He said he did not try to get the appellant an attorney the next morning because the appellant never asked for one. Detective Grooms said that when he started talking with the appellant during the first interview, the appellant seemed "normal." However, the appellant began crying and asked Detective Grooms to take his life, which was abnormal.

Chief Deputy Jeff Maitland of the Gibson County Sheriff's Department testified that he was familiar with the policies at the Gibson County Jail. When the appellant arrived at the jail on January 24, officers would have put him in a holding cell. The appellant would have received an evening meal and should have received a mattress and a blanket. Toilet paper would have been in his cell. Depending on the number of people booked into the jail at the same time as the appellant, it should have taken no more than two or three hours for the appellant to have been put into the holding cell and to have received a mattress. Detective Maitland said the temperature in the jail remained sixty-eight to seventy degrees year-round.

On cross-examination, Deputy Maitland acknowledged that he did not have personal knowledge of the appellant's situation in the jail and did not know whether the appellant received a mattress or blanket. Upon questioning by the court, Deputy Maitland stated that inmates on suicide watch did not receive blankets because the inmates could use the blankets to harm themselves. Jailers checked on a suicidal inmates every fifteen minutes but did not wake sleeping inmates.

The appellant did not testify but introduced transcripts of his January 24 and 26

interviews into evidence. According to the January 24 interview, Detective Grooms introduced himself to the appellant and told the appellant that "technically you are not under arrest at this time and you are not being charge with anything." Detective Grooms told the appellant that "I just want to talk to you about some things," that he was going to read the appellant's rights, and that "[t]hat's something we do to everybody that comes in here . . . that's our policy." The appellant answered, "Alright." Detective Grooms informed the appellant of his rights and said, "Do you understand your rights? Do you understand what I have read to you?" The following exchange occurred:

> **CLIMER:** Well I can't afford a lawyer I can tell you that.
>
> **GROOMS:** Okay. I just read it to you, if you can't afford one, one will be appointed to you. Okay . . . you want to look this over before [you] sign it and by signing this you are not admitting to anything. You are just saying that you want to talk to me.
>
> **CLIMER**: I don't really have anything to say I mean I don't know.
>
> **GROOMS:** Okay. I mean do you want to talk to me to see what I got to say to see what you have to say?
>
> **CLIMER:** Well, I want to hear what you got to say.
>
> **GROOMS:** OK then if you don't mind look that over. You want to look that over before you sign it? You [are] welcome to.
>
> **CLIMER:** You mean I can have an uh an appointed lawyer right now?
>
> **GROOMS:** Well, not at this time.
>
> **CLIMER:** Cause you know uh I know zero about law you know uh.
>
> **GROOMS:** Just like it says, if you want to talk we can talk and you can stop it at any time.

**CLIMER:** Well if I am not being charged with anything why, why is this even being

**GROOMS:** Because that is police procedure[.]

**CLIMER:** Well then if I am not being charged with anything why am I not just cut loose?

**GROOMS:** Because I need to get a statement from you for one.

**CLIMER:** It will probably haunt me for signing this.

**GROOMS:** It's up to you.

**CLIMER:** You can get a statement from me without signing this, can't you?

**GROOMS:** [Yeah], I have to write down you refused to sign. I read your rights to you . . . you understand, isn't that right?

**CLIMER:** [Yeah].

**GROOMS:** I just need you to acknowledge that.  Is that true?

**CLIMER:** Well you gave me this and you read me Miranda.

**GROOMS:** Ok.  You don't have to sign it.  I do want you to make sure that you understand what I read to you.

**CLIMER:** I've just always been told, don't....... don't do anything that'll haunt you later on... you know..I, I

. . . .

**GROOMS:** But you do understand your rights, is that correct?

**CLIMER:** [Yeah.]

**GROOMS:** Ok.  You have looked over this form.

-21-

**CLIMER:** Yes I did.

**GROOMS:** You feel comfortable talking to me?

**CLIMER:** Well not really I am scared to death man because uh I haven't did anything you know.

**GROOMS:** Ok. I am not saying that you have. I'm just saying that I just want to talk to you and basically I know this scares a lot of people....but we do this....I mean we do this to even somebody that bothers pets.

. . . .

**GROOMS:** So you're not going to sign this? It's not no big deal.

**CLIMER:** Naw I

**GROOMS:** I am not going to be mad at you or anything[.]

**CLIMER:** I mean I don't want to.

**GROOMS:** Ok but I just want to make sure you understand your constitutional rights. Ok. You don't have to sign it. I mean it's no big deal. But that's what I want to talk to you about you know we're investigating your mother being missing[.]

**CLIMER:** Right [yeah] you know[.]

**GROOMS:** Do you know....when when was the last time you seen your Mom?

**CLIMER:** December the 11th.

     The appellant told Detective Grooms the victim left with Ray. The appellant and the detective continued to talk, mostly about personal matters that had nothing to do with the crimes. Eventually, Detective Grooms asked the appellant to reveal what happened to the victim. The appellant said, "I'm scared to without an attorney here." Detective Grooms

continued to talk with the appellant. Finally, the appellant told Detective Grooms about finding the victim intoxicated on the porch, cleaning her up, finding her dead in bed two days later, and dismembering her.

At the conclusion of the interview, Detective Grooms asked the appellant if he wanted something to eat, something to drink, and a blanket. The appellant said he wanted something to eat and drink and that he wanted "[a] blanket definitely." Detective Grooms said he would get those things for the appellant.

On January 26, Detective Grooms met with the appellant again. The appellant immediately complained, "I kinda thought I was going to be treated a little better than this. No mattress[.]" The appellant also said, "I can't even sleep without being woke up." Detective Grooms apologized "for the mattress part" and told the appellant that his "blanket and stuff" had been removed from his cell because he was on suicide watch. Detective Grooms said, "I will get you a mattress and a blanket and all that stuff back." The appellant asked what he was being charged with, and Detective Grooms said, "Nothing yet." He told the appellant, "You want to talk to me or not? That's up to you. I can't force you. If you say no, then it's over with." The following exchange occurred:

> **Climer:** So, what do you want to know?
>
> **Grooms:** Well, before I ask you I have to read your rights to you again, David.
>
> **Climer:** Why is that? You done read them to me once.
>
> **Grooms:** I know. And you told me you understood them before. Ain't that right, huh?
>
> **Climer:** I thought I did everything I was supposed to already.
>
> **Grooms:** Well, I just [have] a few questions I need to ask. But if I read your rights to you and you don't want to answer them, that's your choice.
>
> **Climer:** Ok.
>
> **Grooms:** That's your right.
>
> **Climer:** I know the Miranda rights.

-23-

Detective Grooms read the appellant's rights and asked, "Do you want to sign this [form]?" The appellant said no. Detective Grooms asked the appellant if he understood his rights, and the appellant said, "I mean, I know what you're saying. I've got the right to have an attorney here." Detective Grooms asked the appellant again if he understood his rights, and the appellant said yes. Detective Grooms began questioning the appellant.

The State argued that the trial court should deny the appellant's suppression motion because the appellant understood his rights. The State also argued that the appellant made an equivocal request for an attorney and, therefore, that Detective Grooms did not have to stop questioning him. Finally, the State argued that because an arrest warrant was issued for the appellant at 9:00 a.m. on January 26, 2008, less than forty-eight hours from the time the appellant was taken into custody, his detention was presumed reasonable.

At the conclusion of the hearing, the trial court stated, "The only two problems that I'm seeing at this point and I'm not saying that they are a problem. The only two issues that I think I need to research further are the attorney and . . . what I'm going to call the promises question." In a subsequent hearing, the trial court concluded that because the appellant made an equivocal request for counsel, Detective Grooms did not have to stop questioning him. In addition, the trial court concluded that the conditions in the jail had not affected the appellant's ability to make decisions. The trial court denied the appellant's motion to suppress. On appeal, the appellant contends that his confession was involuntary, that he was denied his right to counsel, and that he was detained in jail without due process of law.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

### 1. Involuntary Confession

The appellant contends that the evidence shows his statements were involuntary because he was held in the cold jail without a bed or blanket and because he refused to sign the waiver of rights forms. He also contends that his statements were involuntary because the detective lied to him, telling him that the first interview was not being recorded, and made promises to him, telling him that "I will stick with you to the end" and that "I will go to bat with the DA."

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). As our supreme court has explained,

> In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); State v. Dailey, 273 S.W.3d 94, 102-03 (Tenn. 2009).

Our courts look to the totality of the circumstances surrounding the interrogation to determine if the criteria for a proper waiver are met. See State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993). In doing so, we consider the following factors regarding the voluntariness of a confession: (1) the appellant's age, education or intelligence level, and previous experience with the police; (2) the repeated and prolonged nature of the interrogation; (3) the length of detention prior to the confession; (4) the lack of any advice as to constitutional rights; (5) the unnecessary delay in bringing the appellant before the magistrate prior to the confession; (6) the appellant's intoxication or ill health at the time the confession was given; (7) deprivation of food, sleep, or medical attention; (8) any physical abuse; and (9) threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated,

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was such as to overbear [Appellant's] will to resist and bring about confessions not freely self-determined. The question must be answered with complete disregard of whether or not the accused was truthful

in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (quotation marks and citations omitted).

Turning to the instant case, the appellant was forty years old when he made the statements, possessed a high school diploma, and attended some college classes. According to his presentence report, he has a lengthy criminal history, having been convicted of driving under the influence, numerous traffic offenses, misdemeanor theft, possession of marijuana, carrying a weapon onto school property, and two convictions of assault. He gave his statements before the seventy-two-hour time frame for being taken in front of a magistrate expired. See State v. Davis, 141 S.W.3d 600, 625-26 (Tenn. 2004) (stating that "if an individual is not brought before a magistrate within 72 hours, there has been "unnecessary delay[]'" (quoting Huddleston, 924 S.W.2d at 670)). The appellant was not intoxicated or physically ill at the time of the interviews. Detective Grooms advised the appellant of his rights, and the appellant repeatedly said he understood them. The appellant did not claim during his first interview that he had been deprived of sleep or food. Instead, Detective Grooms offered to get the appellant something to eat and a blanket, and the appellant said he would like to have those things. Although the appellant complained during his second interview that he did not have a mattress or blanket and was being deprived of sleep, the testimony at the suppression hearing shows that the blanket and other items had been taken away from him because he was on suicide watch. Moreover, the appellant did not testify at the hearing regarding the conditions in his cell. The appellant was not physically abused, and there were no threats of abuse. In short, the Huddleston factors do not weigh in favor of finding that the appellant's statements were involuntary.

We also conclude that Detective Grooms's merely telling the appellant that their conversation was not being recorded did not render the appellant's statements involuntary. Finally, Detective Grooms never promised leniency to the appellant. See State v. Downey, 259 S.W.3d 723, 736 (Tenn. 2008). Therefore, we conclude that the appellant is not entitled to relief.

## 2. Right to Counsel

The appellant contends that his statements should have been suppressed because he invoked his right to counsel. Although there may be differences between the protections provided by the United States and Tennessee Constitutions with respect to the right to counsel, the standard used to determine whether one has validly invoked his right to counsel is the same under both. See State v. Turner, 305 S.W.3d 508, 517 (Tenn. 2010); see also Downey, 259 S.W.3d at 731. Once someone requests an attorney, the interrogation must

cease, and the person may not be subjected "to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (quotation marks omitted); see also Maryland v. Shatzer, 130 S. Ct. 1213, 1219 (2010); Turner, 305 S.W.3d at 515-16. At the time of the appellant's suppression hearing, our supreme court had held,

> The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney." If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel.

State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003) (quotation marks and citations omitted). Nine days after the trial court denied the appellant's motion to suppress and four days before the appellant's trial began, our supreme court clarified that this bright-line rule "applies only to post-waiver requests for counsel." Turner, 305 S.W.3d at 519. "Where . . . a suspect makes an equivocal request for counsel prior to waiving Miranda rights, the police are limited to questions intended to clarify the request until the suspect either clearly invokes his right to counsel or waives it." Id.

Here, the appellant points to the following statement on the first page of the January 24 interview as a request for counsel: "You mean I can have an . . . appointed lawyer right now?" The trial court found this to be an equivocal request for an attorney. We agree. Detective Grooms told the appellant that the appellant could not have an attorney at that time, meaning he could not get an attorney for the appellant at that time of night. He said that he did not get the appellant an attorney the next morning because the appellant did not ask for one. However, given that the appellant made his equivocal request prior to waiving his rights,[2] Detective Grooms should have clarified pursuant to Turner whether the appellant wanted to stop the interview until Detective Grooms could arrange for counsel to meet with the appellant.

The appellant also points to the following statement on page thirty-one of the

---

[2]Although the appellant refused to sign the waiver of rights forms, he repeatedly said he understood his rights. Moreover, he has never claimed that he invoked his right to remain silent. Therefore, once he began answering the officer's questions, he demonstrated a waiver of his rights. See Berghuis v. Thompkins, 130 S. Ct. 2250, 2261 (2010) (stating that a suspect does not have to waive Miranda rights expressly in order for the prosecution to show a valid waiver).

interview as a request for counsel: "I'm scared to [talk with you] without an attorney here." We agree that this statement was a second equivocal request for counsel. However, the `appellant made the second statement post-waiver. Therefore, pursuant to Saylor, Detective Grooms did not have to stop the interview and clarify the appellant's request.

Regarding Detective Grooms's improper failure to clarify the appellant's initial equivocal request for counsel, we hold that the error was harmless because the appellant did not implicate himself in the victim's disappearance, death, or dismemberment during the first thirty pages of the interview. See Tenn. R. App. P. 36(b). Although the appellant told Detective Grooms on page thirteen of the interview that he had hit the victim previously, other witnesses, including the appellant's own expert, testified that the appellant had a history of abusing the victim. Therefore, the appellant is not entitled to relief.

### 3. Detained Without Due Process

The appellant argues, without any explanation or citation to authorities, that he was denied due process of law because he was confined in jail from January 24, 2008, to March 3, 2008. He also argues that he was denied due process because he was detained for more than forty-eight hours without a valid determination on probable cause. At the suppression hearing, the appellant introduced two documents into evidence: a "booking sheet," showing that he arrived in the jail on January 24, 2008, and an affidavit of complaint, showing that an arrest warrant was issued on January 26, 2008. The appellant presented no testimony regarding the issue, and the trial court inherently concluded that there was no merit to the appellant's claim. We conclude that the appellant presented insufficient evidence at the hearing for us to determine whether he was detained without due process of law.

### C. Speedy Trial

The appellant contends that he was denied his right to a speedy trial. The State argues that the appellant's right to a speedy trial was not violated. We agree with the State.

Both the Sixth Amendment to the United States Constitution and article 1, section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial. An identical right is found in Tennessee Code Annotated section 40-14-101, which provides, "In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel." Moreover, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, presentment, information, or complaint. These guarantees were designed "to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories

-28-

diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v. United States, 505 U.S. 647, 654 (1992)). In reviewing the trial court's determination regarding whether a defendant's right to a speedy trial was violated, this court should use an abuse of discretion standard. See State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996).

The right to a speedy trial is implicated when there is an arrest or a formal grand jury accusation. Id. at 491. To determine whether a defendant's constitutional right to a speedy trial has been violated this court must conduct the balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972). State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981); State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973). Under the Barker analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530.

We note that the appellant filed a demand for a speedy trial on June 12, 2009, but that he did not move to dismiss the indictment for failure to provide a speedy trial. Moreover, he has not cited to any portion of the appellate record where he asked the trial court to dismiss the indictment based upon the denial of the right to a speedy trial. Panels of this court have held that a defendant's failure to file a motion to dismiss waives the issue. See State v. John Tyree Lytle, No. E2003-01119-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 399, at **6-7 (Knoxville, May 3, 2004); State v. Thomas E. Davenport, No. M2000-00317-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 903, at **7-8 (Tenn. Crim. App. Nov. 17, 2000); State v. James W. Aldridge, C.C.A. No. 6, 1990 Tenn. Crim. App. LEXIS 682, at **11-12 (Jackson, October 10, 1990). However, published authority supports a contrary result. See Bishop, 493 S.W.2d at 84 (stating that even a defendant's failure to demand a speedy trial does not waive the issue); see also State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 550, at *88 (Tenn. Crim. App. June 28, 2002) (citing Barker and Bishop and noting the same), perm. to appeal denied, (Tenn. 2003). Therefore, we will consider whether the appellant's right to a speedy trial was violated.

A delay of one year or longer will trigger an inquiry into a speedy trial violation. See State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001). In the instant case, the appellant was arrested on January 24, 2008,[3] but was not tried for the offenses until March 2010. Thus, the

---

[3]We note that Detective Grooms testified at trial and at the suppression hearing that the appellant was not under arrest on January 24, 2008. However, he also testified that police officers "took [the appellant] into custody" on January 24, 2008, handcuffed him, put him into a patrol car, and transported him to jail. The appellant was booked and placed into a holding cell, where he remained for eight hours until Detective Grooms began interviewing him. The appellant asked why he could not leave, and Detective Grooms told him, "Because I need to get a statement from you." On page thirty-three of the interview, the appellant

(continued...)

delay meets the threshold for consideration of the other factors.

The second factor, the reason for delay, generally falls into one of four categories: "(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996) (footnotes omitted). The appellant contends that the State's acts caused the delay, arguing that the State did not file a response to his motion for discovery until March 9, 2009, and that orders directing mental evaluations for him were not filed until June 23, 2009, and August 6, 2009. However, the appellant does not argue that the delay was intentional to gain a tactical advantage over the defense, was deigned to harass him, or was due to indifference or negligence. Moreover, our review of the record shows that part of the delay was caused by the defense. For example, the appellant did not file a motion to suppress his statements until October 9, 2009, and did not file a response to the State's March 9, 2009 request for discovery until March 5, 2010, just eighteen days before trial. We also note that although Dr. Symes received the victim's bones for analysis on June 26, 2008, his written report was not completed until August 11, 2009, demonstrating that the delay also was necessary for the fair and effective prosecution of the case. Therefore, this factor does not weigh in favor of the appellant.

Next, we must consider the appellant's assertion of the right to a speedy trial. Assertion of the right to a speedy trial by a defendant is given great weight in the determination of whether the right was denied. Barker, 407 U.S. at 531-32. "Failure to assert the right implies a defendant does not actively seek a swift trial." Wood, 924 S.W.2d at 347. In this case, the appellant asserted his right to a speedy trial on June 12, 2009, almost eighteen months after his arrest. Thus, this factor does not weigh heavily in his favor.

Finally, we must consider prejudice to the appellant. This is the "final and most important factor in the [speedy trial] analysis." Simmons, 54 S.W.3d at 760. "Courts do not necessarily require a defendant to affirmatively prove particularized prejudice." Id. (citing Doggett, 505 U.S. at 654-55. Our supreme court has explained that "when evaluating this factor courts must be aware that the speedy trial right is designed: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize anxiety and concern accompanying

[3](...continued)
mentioned that he was wearing shackles. A person is under arrest when there is an "actual restraint on the [person's] freedom of movement under legal authority of the arresting officer." State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999). Despite Detective Grooms's claim to the contrary, the appellant clearly was under arrest on January 24, 2008.

public accusation; and (3) to limit the possibilities that long delay will impair the defense." Id.

The appellant contends that his "lengthy delay and incarceration" resulted in his being confined in a jail cell with Smith and Powell, where he "'went mad'" and made incriminating statements. However, the appellant shared the same cell with Powell and Smith in mid-March 2008, a mere two months after his arrest. Therefore, any prejudice to the appellant that resulted from his being confined with Smith and Powell cannot be attributed to a delay in his trial. The appellant offers no other explanation as to how he was prejudiced by the delay. Therefore, we conclude that the State's delayed prosecution of the appellant did not violate his right to a speedy trial.

### E. Failure to Dismiss Juror for Cause

Finally, the appellant contends that the trial court erred by failing to dismiss juror Yates for cause because Yates stated during voir dire that she had read information about the case in the newspaper and had reached a conclusion on the appellant's guilt. The State contends that the trial court properly refused to dismiss Yates from the panel because she said she could be impartial. We conclude that the appellant is not entitled to relief.

During jury voir dire, prospective juror Yates informed the State that she had read about the case in the newspaper "[b]ack when it happened." The State asked if she had formed any opinion about the appellant's guilt, and she answered, "That would be hard to say." The following exchange occurred:

> [The State]: So you have an idea?
>
> MS. YATES: Uh huh.
>
> [The State]: You haven't sat down and formally thought about it and formed that opinion.
>
> MS. YATES: Right.
>
> [The State]: But you have an idea?
>
> (Ms. Yates indicated affirmatively.)
>
> [The State]: And you base that upon what you read in the paper?

MS. YATES: Yes.

[The State]: I'll bet you would agree that everything you read in the paper is not always correct.

MS. YATES: You're right. It's not always true.

[The State]: Would you be able to set that aside and your general thinking or your general idea of whether or not he's guilty or not guilty and base your opinion on what you hear in this courtroom over the next couple of days?

MS. YATES: Yes.

[The State]: You could do that?

MS. YATES: Uh huh.

Upon being questioned by defense counsel, Yates stated that she had not seen or heard anything about the case on television or radio. She said that when she read about the case in the newspaper, she "just wondered how a person could do that." She said that "[a] lot of times what you read in the paper is not actually the actual truth" but acknowledged that there was a chance she could not be impartial. The trial court asked her, "What do you think you will do in terms of partiality or impartiality?" Yates stated, "I think I can be impartial." Defense counsel challenged Yates for cause, but the trial court refused, stating, "I'm satisfied with the answer she gave."

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Parties in civil and criminal cases are granted "an absolute right to examine prospective jurors" in an effort to determine they are competent. See Tenn. Code Ann. § 22-3-101. "A court may discharge from service a grand or petit juror . . . for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part that will prevent the juror from acting impartially shall constitute such cause." Tenn. Code Ann. § 22-1-105. Therefore, trial courts have "wide discretion in ruling on the qualifications of a juror." State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993). Absent an abuse of discretion, this court will not overturn the trial court's ruling. Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). Irrespective of whether the trial judge should have excluded a challenged juror for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. Howell, 868 S.W.2d at 248; State v. Thompson, 768

-32-

S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. Ross v. Oklahoma, 487 U.S. 81, 89 (1988); State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990).

Yates told the State that she would be able to set aside what she had read in the newspaper and decide the appellant's guilt based on the evidence presented. Upon being questioned by the trial court, she again stated that she thought she could be impartial. Regardless, the appellant has not shown that the jury was not fair or impartial. Thus, he is not entitled to relief.

### III. Conclusion

The evidence is insufficient to support the appellant's conviction of first degree premeditated murder but sufficient to support a conviction for the lesser-included offense of second degree murder. Therefore, the appellant's conviction is reduced to second degree murder, and the case is remanded to the trial court for resentencing. The appellant's conviction for abuse of a corpse is affirmed.

_____
NORMA McGEE OGLE, JUDGE